**H. L. SCOTT, Petitioner,**

v.

**INGLE BROS. PACIFIC, INC., Respondent.**

No. B–3374.

Supreme Court of Texas.

Dec. 27, 1972.

C. J. Humphrey, Amarillo, for petitioner.

Gibson, Ochsner, Adkins, Harlan & Hankins, Michael C. Musick, Amarillo, for respondent.

GREENHILL, Chief Justice.

The question before us is whether the parties had entered into a contract whereby Ingle Bros. Pacific, Inc., agreed to employ H. L. Scott. The trial court held that, as a matter of law, there was a contract of employment; and based on jury findings of a breach of the contract, it entered a judgment for Scott for some $54,210. The court of civil appeals completely disagreed. It held that as a matter of law there was no employment contract. 478 S.W.2d 210. We disagree with both courts. Our holding is that there is an issue of fact as to the intention of the parties. Accordingly, as to this portion of the case which is before us, we reverse the

judgment of the court of civil appeals and remand the cause to the district court for a new trial.

The facts are set out in the opinion of the court of civil appeals. As relevant here, Scott owned and operated a mop manufacturing plant in Amarillo. An executive of Ingle indicated a desire to buy Scott's plant. A "purchase agreement" was entered into on June 16, 1969, whereby Scott agreed to sell to Ingle all inventory and other assets, the trade name, and the manufacturing and marketing rights for $50,000. Of this, $35,000 was to be in cash; and the balance of $15,000 was evidenced by a promissory note.

The "purchase agreement" continued:

"An Employment Agreement has been prepared wherein H. L. Scott will manage the business for a minimum of five years at an annual salary of $15,000, payable monthly, with a $3,000 increase after the 1st year, provided annual gross sales exceed $200,000.

"A separate lease agreement shall be drawn between H. L. Scott and Ingle as follows: ten year lease at $550 monthly with option to renew for additional 5 years at $550 monthly plus tax increase over 1969 to be added."

The sale was consummated. The contemplated "separate lease agreement" was executed, but both parties agreed that no separate employment agreement had been executed before the "purchase agreement," and none was executed thereafter. Scott immediately assumed management of the plant at $15,000 per year. The gross sales increased; and Scott's salary was, as indicated in the "purchase agreement," raised $3,000 per year after 9 months.

About a year and a half after the "purchase agreement" was executed, a dispute began when Ingle decided to close the Amarillo plant and move it to New Mexico. Ingle had not paid Scott the $15,000 balance of the purchase price evidenced by the note. Ingle authorized Scott to pay himself a certain sum out of company funds; but on the advice of counsel, Scott paid himself a different amount in a different way. Ingle then fired Scott. Scott brought this suit on the above employment agreement. Ingle took the position that there was no employment contract. The jury found that Scott had been discharged without good cause.

■ So we return to the problem stated at the outset: was that portion of the "purchase agreement" dealing with the employment of the seller, Scott, an enforceable contract? This depends upon the intention of the parties. An agreement simply to enter into negotiations for a contract later does not create an enforceable contract. But parties may agree upon some of the terms of a contract, and understand them to be an agreement, and yet leave other portions of an agreement to be made later.

The writing in question says that an employment agreement "has been prepared." This was not an accurate statement. None had been, and this is the problem. It is capable of meaning, "an agreement has been arranged, or has been made, whereby Scott will be employed to manage the plant for $15,000 per year," et cetera. Or it could mean that the parties contemplated negotiations for an employment contract with those basic terms. Or it could mean that the parties were just wrong in putting the statement in the purchase agreement, and there was no employment contract. It is of significance that Scott did sell the plant to Ingle; and he did begin to manage it as an employee at the beginning salary of $15,000. He did get the $3,000 per year raise, but sooner than the one year stated in the contract. Whether the execution of a separate employment agreement was, and is, essential to a mutuality of assent is a question of the intention of the parties.

In this troublesome area, Corbin on Contracts is helpful. In Section 29, Partial

Agreements—"Contracts to Make a Contract," it is stated that:

"People do business in a very informal fashion. . . . A transaction is complete when the parties meant it to be complete. It is a mere matter of interpretation of their expressions to each other, a question of fact. * * *

"Even though certain matters are expressly left to be agreed upon in the future, they may not be regarded by the parties as essential to their present agreement. Furthermore, the terms left for future settlement may be within definite and prescribed limits." 1 Corbin on Contracts (1963) 87–91.

The text continues, as relevant here:

"The court will be more ready to find that the apparently incomplete agreement was in fact complete and required the payment and acceptance of a 'reasonable' price or a performance on 'reasonable' terms, in case the parties have already rendered some substantial performance or have taken other material action in reliance upon their existing expressions of agreement. The fact that they have so acted is itself a circumstance bearing upon the question of completeness of their agreement. * * *

"Two persons may fully agree upon the terms of a contract, knowing that there are other matters on which they have not agreed and on which they expect further negotiation. Such an expectation does not prevent the agreement already made from being an enforceable contract. This may be true even though they expressly provide in their agreement that the new matters, when agreed upon, shall be incorporated into a written lease or other formal document along with the contract already made." Id. at 93–95.

Corbin concludes that:

"Often it is a difficult question of fact whether the parties have this under-standing; and there are very many decisions holding both ways. * * * It is a question of fact that the courts are deciding, not a question of law. * * * In very many cases the question may properly be left to a jury." Id. at 87.

Further in this area, it is stated in 17 Am.Jur.2d, Contracts § 28,

"Many cases support the general rule that the fact, in and of itself, that parties to an . . . informal agreement intend that it shall be reduced to a . . . more formal contract will not necessarily prevent present, binding obligations from arising, notwithstanding the contemplated . . . formal contract is never drawn up and executed . . . . [at page 365]

"However, the fact that parties to negotiations contemplated the drawing and execution of a formal written contract is regarded in numerous cases as evidence that they intended the prior . . . informal agreement . . . to be merely tentative and not final. It is not, of course, conclusive evidence of such an intention . . . ." [at page 366]

The problem is discussed in § 26 of the Restatement of Contracts. The Tentative Draft of § 26 for the Restatement, Second, states the rule,

"Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations."

The comments thereunder suggest circumstances which may be helpful in determining whether a contract has been concluded. See also Mississippi & Dominion S. S. Co. v. Swift, 86 Me. 248, 29 A. 1063 at 1066–1067 (1894), which is cited in the above tentative draft. This court said in Simmons & Simmons Construction Co. v. Rea, 155 Tex. 353, 286 S.W.2d 415 (1955)

that "intention is usually an inference to be drawn by the fact finder from other facts and circumstances."

The charge to the jury in this case did not contain an issue as to whether the parties intended for there to be a contract of employment under the basic terms set out in the "purchase agreement." Ingle Bros. objected to the charge on this ground, and its objection was overruled. The point was preserved and is before us by cross point. An issue should have been submitted, and the cross point is sustained.

■ Ingle objected to special issue number one on the ground that it was too broad. It inquired, "Do you find . . . that H. L. Scott was discharged by the Defendant without good cause?" There followed a definition of "good cause for discharge" which need not be repeated here. The Defendant requested other special issues which would have asked about specific acts which were relevant to Scott's firing. The point is overruled. Haas Drilling Co. v. First National Bank in Dallas, 456 S.W.2d 886 (Tex.1970). In dealing with an objection that an issue was "global," this Court in *Haas* recognized wide discretion in the trial court in the submission of issues in non-negligence cases.

We have examined the other points and cross points of the parties, and they are overruled.

In the trial court, there were issues as to the balance due on the note Ingle gave Scott as purchase price, for attorney's fees and related matters. No points were brought to the court of civil appeals (or to us) as to such matters, and the court of civil appeals affirmed this portion of the trial court's judgment. There is nothing for us to decide as to that portion of the case. We, therefore, sever the cause of action as to matters arising out of the promissory note; and as to such, we affirm the judgment of the court of civil appeals. As to the severed cause of action arising out of the employment contract, we reverse the judgment of the court of civil appeals and remand the same to the district court for a new trial.

The judgment of the court of civil appeals is, therefore, affirmed in part and reversed and remanded in part.